# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**,

Plaintiff,

v.                                    **Case No. 05-CR-94**

**JORGE L. ALVAREZ,**

Defendant.

---

## RECOMMENDATION TO THE HONORABLE LYNN ADELMAN ON THE DEFENDANT'S MOTION TO SUPPRESS

---

On April 5, 2005, the grand jury returned a two-count indictment against the defendant Jorge L. Alvarez ("Alvarez"). Both counts of the indictment charge Alvarez with possessing and intending to distribute controlled substances, in violation of 21 U.S.C. § 841(a) and (b).

Alvarez has filed a motion to suppress the marijuana and cocaine specified in the indictment, which law enforcement officers seized during a traffic stop and search of Alvarez's vehicle. This court conducted an evidentiary hearing to address issues raised in Alvarez's motion to suppress on July 20, 2005. The government appeared by Assistant United States Attorney Elizabeth M. Blackwood. Alvarez appeared in person and by his attorney, William J. Reddin. The post-hearing pleadings on Alvarez's motion to suppress are now closed and the motion is ready for resolution.

**MOTION TO SUPPRESS**

At the evidentiary hearing, City of West Allis detective Jeffrey R. Nohelty ("Detective Nohelty") and City of Milwaukee detective Steven Wellens ("Detective Wellens") testified as to the circumstances surrounding the traffic stop, vehicle search, and the subsequent seizure of the narcotics specified in the indictment. Alvarez presented no witnesses. Accordingly, a summary of the relevant events from the officers' perspective follows.

## I. Detective Nohelty: Wiretap and Surveillance Efforts

Detective Nohelty testified regarding the drug trafficking investigation that lead to the traffic stop and search challenged by Alvarez. Detective Nohelty, the lead officer assigned to the investigation, testified that officers conducted a wiretap on telephones used by Tarcisio Alcala ("Alcala") and Alejandro Cisneros ("Cisneros"). Officers also surveilled persons believed to be their associates. (Tr. 7-9.). Several of these efforts lead officers to suspect Alvarez of trafficking drugs with Alcala and were discussed at the evidentiary hearing. According to Detective Nohelty, calls were placed to Alcala from a phone registered to Alvarez's parents. (Tr. 11.). During numerous such calls, a male now believed to be Alvarez asked Alcala whether he "had any good news for him," Alcala responded that "he's getting it," and later a meeting between the male and Alcala was arranged. (Tr. 11.). Shortly before the meeting time, a male called Alcala from the Alvarez phone number and said that he was approaching Alcala's door. Alcala responded that he would answer the door. At the same time, officers observed a male enter Alcala's residence; come out of the residence a short time later; drive his vehicle to the rear of the building; and open his trunk. (Tr. 11-13.). A license plate check on the male's vehicle indicated that it was registered to Alvarez. In addition, a criminal history check

2

on Alvarez revealed that he was previously convicted of drug trafficking, and a photo confirmed that Alvarez was the male observed. (Tr. 14.).

On another occasion, officers seized approximately $27,000 from an Illinois vehicle leaving Alcala's residence. Three days later, on August 6, 2004, officers intercepted a call from Alcala to the Alvarez phone number in which the male who answered the phone stated that "he had 20 for [Alcala] and would be over to see him." (Tr. 16.). Believing the caller to be Alvarez, Detective Nohelty conducted surveillance on the Alvarez residence. He observed Alvarez leave his residence in a van owned by Alcala, drive to Alcala's residence, make several calls to Alcala while in transit, remain inside Alcala's residence for a few minutes, and leave. (Tr. 17.). Considering these facts in aggregate, Detective Nohelty suspected this incident to involve drug trafficking activities.

Then, from August 19, 2004 and leading up to Alvarez's arrest on August 20, 2004, officers intercepted several conversations between Alvarez and Alcala that heightened their suspicions of Alvarez. During the first conversation, Alvarez calls Alcala and states "let me know when you have the good news," and Alcala says he will call Alvarez early the next morning. (Tr. 20.). Later that night, Alcala calls Alvarez and asks him to check back around 6:00 am the next morning. In addition, Alvarez asks "how the CD is. Is it nice?" and Alcala responds that "it is the same." (Tr. 20-21.). The next morning, Alvarez called Alcala, who said "they are waiting," and Alvarez responded that he was on his way and was traveling near Muskego Avenue and Burnham Street. Then, Alvarez calls Alcala and they discuss 50th Street.

Simultaneous with this conversation, officers were conducting surveillance on Alvarez. Based on Alvarez's location far from 50th Street, the previously intercepted conversations, and his experience in drug trafficking investigations, Detective Nohelty believed Alvarez was discussing the

3

quantity of narcotics that Alvarez and Alcala agreed to exchange. (Tr. 36-37.). Accordingly, officers followed Alvarez to his destination, which was the residence of Carolyn Alcala ("Carolyn"), Alcala's ex-wife. Alvarez's arrival at that location was significant because Carolyn was intercepted earlier that morning asking Alcala "how many — do I give 40 tortillas to this guy? He had called, and I told him there's 40 dozen." (Tr. 37-38.). This too, Detective Nohelty believed to be coded conversation regarding the quantity of narcotics that would be exchanged in the near future.

An agent surveilling Carolyn's residence observed Alvarez drive to the rear of the residence and open his trunk. Then, Carolyn came out of the house, threw a large black garbage bag into the trunk of Alvarez's car, and Alvarez left. (Tr. 39.). These observations were immediately communicated to Detective Nohelty, who instructed Detective Wellens to follow Alvarez and to stop Alvarez's vehicle if he committed a traffic violation. (Tr. 39-40.). However, Detective Nohelty testified that he believed there was probable cause to stop Alvarez's car in light of the intercepted conversations and observations of Alvarez and would have instructed that Detective Wellens stop Alvarez even if no traffic violation occurred. (Tr. 50.).

## II. Detective Wellens: Traffic Stop and Search

Upon receiving Detective Nohelty's instructions, Detective Wellens located Alvarez and began following him in an unmarked car. Based on his own speed of travel, and after following Alvarez for three to four blocks, Detective Wellens estimated that Alvarez was traveling approximately fifteen miles per hour above the speed limit. (Tr. 62.). He conducted a traffic stop on that basis.

After informing Alvarez of the reason for the traffic stop and briefly questioning Alvarez about his criminal record and driving history, Detective Wellens ran a criminal background check and a driver's licence check on Alvarez. The criminal history check revealed two prior drug distribution

4

charges and a gun offense. (Tr. 58.). While the driver's license check was still being processed, Detective Wellens returned to Alvarez's vehicle, asked for consent to search the car, and Alvarez refused. (Id.). At that point, Detective Wellens observed several individuals exit their cars to watch what was happening at the traffic stop. This, in addition to Alvarez's prior gun offense, led Detective Wellens to conduct a pat-down of Alvarez to ensure he did not carry a weapon. (Tr. 58, 64.).He discovered a large bulge in Alvarez's front pants pocket, which Alvarez said was approximately $3,000 cash. Next, Detective Wellens seated Alvarez in the back of Alvarez's car and returned to his squad to check whether the driver's license check had finished. It had not and, while Detective Wellens was waiting for the results, he contacted the drug canine unit and requested them to the scene. (Tr. 59.).

Next, Detective Wellens returned to Alvarez's vehicle and informed him that the drug dog unit was in transit to their location and that he was aware of Alvarez's previous convictions. In response, Alvarez stated "oh, you're going to find the stuff anyways. It's on the front seat. It's in the bag. Go ahead and search." (Tr. 59.). Detective Wellens then searched the car and found a bag in the front seat containing cocaine, marijuana, and a digital scale and a second bag in the trunk that contained approximately fifty pounds of marijuana. (Tr. 60-61.).

## ALVAREZ'S POSITION

Alvarez argues that the drugs seized from the traffic stop should be suppressed because: (1) his consent to Detective Wellens' search was the result of an unlawful detention and (2) officers did not have probable cause to search his vehicle. In support of his first claim, Alvarez says that he was held for longer than it would have taken to issue a speeding citation and that his consent was influenced by Detective Wellens' statement that a canine unit had been summoned. In support of his

5

second claim, Alvarez says that the officers could not have been certain that he was the male speaking with Alcala or that the intercepted conversations regarded drug trafficking. In addition, Alvarez submits that the officers did not directly observe him exchange narcotics, and that several of the inferences drawn by the government—namely that the garbage bag Carolyn put into Alvarez's trunk contained drugs and that code was used to disguise discussions about drug trafficking—are not reasonable.

## ANALYSIS

In addressing the legality of Detective Wellen's actions under the Fourth Amendment, this court asks two questions: (1) did Detective Wellens have at least a reasonable suspicion that Alvarez had committed a criminal offense when the traffic stop took place and (2) were Detective Wellens' actions reasonably related in scope and duration to circumstances that justified the stop. The two arguments presented in Alvarez's motion to suppress implicate the second question, with Alvarez conceding that the traffic stop was legally justified based on his speeding. Alvarez's challenge regarding the validity of his detention prior to the vehicle search will be discussed first.

### I. Validity of Alvarez's Detention and Consent

The Supreme Court recently reiterated that "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, --- U.S. ----, ----, 125 S.Ct. 834, 837 (2005); United States v. Carpenter, 406 F.3d 915, 916 (7th Cir.2005). Thus, the Court continued, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Id. While officers need not have reasonable suspicion to ask questions unrelated to the purpose of the traffic stop, questions that

6

prolong custody may affect the reasonableness of the detention. Ultimately, "[w]hat the Constitution requires is that the entire process remain reasonable." <u>United States v. Childs</u>, 277 F.3d 947, 954 (7th Cir.2002).

With these standards in mind, the court concludes that Detective Wellens' actions and the duration of the traffic stop prior to Alvarez's consent were reasonable. As to the duration of the traffic stop, approximately thirty-five minutes passed before Alvarez consented to a search of his vehicle. During that time, Detective Wellens spoke with Alvarez and ran necessary license and criminal history checks. (Tr. 62-63). While Detective Wellens also conducted a pat-down search of Alvarez and summoned a canine unit, neither of those actions extended the duration of Alvarez's detention. In fact, both were done while Detective Wellens waited for the results of the license check.

In addition, both actions were reasonably related to the initial purpose of the stop and other information that Detective Wellens obtained. Detective Wellens testified that the pat-down was based on a concern for his personal safety, due to the fact that individuals approximately one block away left their cars to monitor the traffic stop. This compounded concerns raised by the fact that the criminal history check revealed several prior convictions that Alvarez failed to disclose during his initial discussion with Detective Wellens, including a firearm conviction.

The pat-down revealed that Alvarez was carrying approximately $3,000. This information—together with Detective Nohelty's allegation that Alvarez was involved in drug trafficking activities and Alvarez's two prior, undisclosed drug trafficking convictions—constitutes reasonable basis for Detective Wellens to request a canine unit. Moreover, where a defendant was stopped for speeding, without *any* basis for suspecting drug trafficking, the Supreme Court recently held that use of a narcotic detection dog does not "change the character of a traffic stop that is lawful

7

at its inception and otherwise executed in a reasonable manner." Illinois v. Caballes, 543 U.S. 405, 125 S. Ct. 834 (2005). In reaching this conclusion, the court reasoned that use of a narcotic dog does not implicate Fourth Amendment privacy interests because "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess." Id. at —, 125 S.Ct. at 838. Thus, neither probable cause nor even a reasonable, articulable suspicion is required. Id.

In light of Caballes, the duration of the traffic stop, the reasonable procedures used, and the minimal intrusion to Alvarez, the court concludes that Detective Wellens acted reasonably at all times prior to Alvarez's consent. While the license and registration check might have taken longer for dispatch to process than usual (Tr. 65.), it is clear that Detective Wellens did not attempt to prolong Alvarez's detention any longer than necessary.

Once consent was given, the search was rendered reasonable under the Fourth Amendment unless given involuntarily. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Alvarez says that his consent was influenced by the fact that a drug-dog had been summoned. That knowledge, however, does not render his consent involuntary. On the contrary, the sequence of events reflects that Alvarez was aware of his rights and the consequences of his decisions, and was simply trying to avoid Detective Wellens from discovering the narcotics. Alvarez failed to disclose his prior drug trafficking convictions and refused Detective Wellens' initial request to search his vehicle. Once Alvarez believed that a drug dog would sniff his vehicle—a measure that does not implicate the Fourth Amendment—Alvarez told Detective Wellens that he believed discovery of the drugs was inevitable. In other words, he believed that further investigatory efforts would ultimately result in his arrest and wanted to proceed in a cooperative manner. Nothing prevented Alvarez from requiring Detective

8

Wellens to follow through with the investigation as he intended, and there is no indication of hostility between Alvarez and Detective Wellens. Moreover, Detective Wellens never informed Alvarez that he intended to search the vehicle regardless of Alvarez's consent based on information obtained from the wiretap and Detective Nohelty's instructions. Accordingly, suppression is not warranted on the basis that Alvarez's consent was invalid.

## II. Probable Cause

The same is true in regard to Alvarez's claim that the search was not supported by probable cause. Probable cause is particularly important in the case at bar because the automobile exception allows a warrantless search and seizure of a car if the search is justified by probable cause. United States v. Rivera, 825 F.2d 152, 158 (7th Cir. 1987)(citing California v. Carney, 471 U.S. 386 (1985); Chambers v. Maroney, 399 U.S. 42 (1970); Carroll v. United States, 267 U.S. 132 (1925)). Law enforcement official have probable cause where "'the facts and circumstances within their knowledge and of which they have reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the suspect committed or was committing an offense.'" United States v. Jones, 72 F.3d 1324, 1331 (7th Cir. 1995)(citing United States v. Levy, 990 F.2d 971, 973 (7th Cir. 1993)).

In the present case, Detective Wellens learned that Alvarez lied about his previous drug trafficking and firearm convictions, discovered that Alvarez was carrying $3,000 cash and observed several individuals exit their car to monitor the traffic stop. In conjunction with Detective Nohelty's claim that Alvarez was trafficking drugs on that day, these facts constitute probable cause to believe that narcotics would be found in Alvarez's vehicle. Moreover, under the collective knowledge doctrine, acting officers "need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer." United States v. Parra, 402 F.3d 752, 764

9

(7th Cir. 2005). The officer's actions are proper if the knowledge of the directing officer is sufficient to constitute probable cause. Id. Courts have applied the collective knowledge doctrine in two situations: (1) when information from one jurisdiction is actually related to offices or agencies in another jurisdiction to permit coordination of investigations and the speedy apprehension of fleeing suspects and (2) when officer are working in communication with each other while working together at a scene. In the latter group of cases, the knowledge of the officers may be imputed "'even when there is not express testimony that the specific or detailed information creating justification for a stop was conveyed (though of course the information actually possess by the officers must be sufficient to justify the stop or arrest).'" Id. (quoting United States v. Nafzger, 974 F.2d 906, 911 (7th Cir. 1992)).

In the present case, Detective Wellens testified that he was working in close communication with Detective Nohelty and other officers in regard to the Alcala drug trafficking investigation. In fact, Detective Wellens said that he was one of the surveillance officers at the scene on the date of Alvarez's arrest. (Tr. 53-54.). Officers were communicating conversations that were intercepted from Alvarez's phone to Detective Nohelty. Simultaneously, Detective Nohelty was informed about what the surveillance team observed. Armed with all of this information, Detective Nohelty instructed that Detective Wellens to stop Alvarez. Accordingly, this case presents the precise situation contemplated by the second prong of the collective knowledge doctrine. This means that, while Detective Nohelty provided significantly more detail about the drug trafficking investigation than Detective Wellens, whose testimony focused on the traffic stop, the collective knowledge doctrine allows the court to impute information about the investigation to Detective Wellens, in evaluating probable cause. See Parra, 402 F.3d at 766.

10

In regard to those details, Alvarez objects to the fact that officers never directly observed him in possession of narcotics or overheard conversations that mention drugs. Probable cause, however, does not require direct evidence. Indirect evidence is adequate if, under the totality of the circumstances, there is reason to believe that an offense has been committed. Based on his training and experience, Detective Nohelty testified that he believed Alvarez, Alcala, and Carolyn used code words to disguise discussions about controlled substances. While Alvarez disputes this, he asserts no countervailing explanation for what was meant by the reference to 50th Street when Alvarez was far from that location, by the discussion of forty tortillas out of context, or by statements such as "let me know when you have the good news," and "he had 20 for [Alcala] and would be over to see him." Moreover, while officers did not initially know that Alvarez was the male heard discussing what they believed to be drug trafficking activities with Alcala, they knew that the calls were registered to Alvarez's parents' residence and later identified Alvarez by physical surveillance. In fact, repeated observations of Alvarez in accord with meetings discussed in drug-related conversations quickly resolved any initial uncertainty. Furthermore, while officers did not directly observe drugs being transferred into Alvarez's car, the inference that a drug exchange occurred is certainly a reasonable one in light of the many preceding conversations, the observation of a garbage bag being put into Alvarez's trunk, and Alvarez's brief visit to Carolyn's residence. In light of all of these considerations, officers had probable cause to believe that Alvarez had drugs in his vehicle at the time of the traffic stop. Accordingly, probable cause constitutes a second basis for Detective Wellens' search, and the court will recommend that the motion to suppress be denied.

For all the reasons discussed herein, the court now enters the following recommendation on the defendant's motion to suppress:

**IT IS THEREFORE RECOMMENDED** that Alvarez's motion to suppress be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin, this <u>8th</u> day of December, 2005.

<div style="margin-left:40%">

s/AARON E. GOODSTEIN
United States Magistrate Judge

</div>