# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                Case No. 05-CR-94

**JORGE ALVAREZ**
    **Defendant.**

## DECISION AND ORDER

  Defendant Jorge Alvarez moved to suppress evidence seized from his vehicle after a traffic stop. The motion was assigned to a magistrate judge who held a hearing then issued a recommendation that the motion be denied. Defendant objects, requiring me to review the motion de novo. See Fed. R. Crim. P. 59(b)(3).

### I. FACTS

  City of West Allis Detective Jeffrey Nohelty was the lead officer in a drug trafficking investigation focused on Tarcisio Alcala and Alejandro Cisneros. Officers had obtained wire taps on phones used by Alcala and Cisneros and were engaged in physical surveillance of both. (Tr. at 8, 10.) Based on information obtained from the wire, on June 8, 2004, officers seized $11,000 in cash from a vehicle occupied by Cisneros and a man named Jesus Munge. During subsequent calls, Cisneros and Munge debated who was going to explain to Alcala why the money was taken and how. (Tr. at 9.)

  On August 3, 2004, after over-hearing several calls about the possibility of a "money drop" to Alcala, officers stopped a vehicle after it left Alcala's apartment and seized $27,000 in cash. (Tr. at 17-18.) After the seizure, the driver of the vehicle contacted

Alcala and said, "we have to stop. We're being watched. There's a bunch of cops watching us with plain clothes." (Tr. at 18.) Alcala disbelieved the caller, stating that no one knew he was in the country. (Tr. at 18.) In fact, officers knew that Alcala had traveled to Mexico, then returned to the United States, and they reinstated the tap on his phone after he returned. (Tr. at 10.)

On August 3 and 4, 2004, officers intercepted calls between Alcala and a man later identified as defendant,[1] in which defendant asked Alcala whether he had "any good news for him." (Tr. at 11.) Alcala responded, "yes, [I'm] getting it." (Tr. at 11.) The two arranged a meeting at Alcala's apartment building, and officers observed defendant arrive in a green Honda, briefly enter the apartment, then come back out, drive his vehicle to the side of the building and open the trunk, though they could not see whether he placed anything inside. (Tr. at 44.) Nohelty ran defendant's record and learned that he had prior convictions for drug distribution and weapons offenses. After he left, officers tailed defendant back to his residence at 1141 North 24th Place. (Tr. at 12-15.)

On August 6, 2004, officers intercepted a call from Alcala to defendant, in which defendant stated that he "had 20 for him and would be over to see him." (Tr. at 16.) Officers surveilling defendant's and Alcala's residences then observed defendant, driving a white van officers had previously seen Alcala use, drive to Alcala's apartment. Defendant entered the building for a few minutes, then came back out and left. (Tr. at 16-17.)

---

[1] Officers traced the phone line defendant used to defendant's mother at 1141 North 24th Place, then Nohelty identified defendant from a photo when defendant came to Alcala's apartment. The license plate of the Honda defendant drove to Alcala's apartment listed to defendant at 1141 North 24th Place. (Tr. at 10-14.)

2

On August 19, 2004, at about 2:27 p.m. officers intercepted a call from defendant to Alcala, in which defendant stated: "let me know when you have the good news." (Tr. at 20.) At 8:28 p.m. that night, Alcala called defendant and asked him to call in the morning around six. Defendant asked "how the CD is. Is it nice?" Alcala replied "the same." (Tr. at 20-21.) The next morning, shortly after 8:00 a.m., Alcala called defendant but got his voice mail. (Tr. at 22.) At about 10:35 a.m., defendant called Alcala, who stated "they are waiting for you." Defendant replied that he was on Muskego and Burnham, pulling up right now. (Tr. at 33.) At 10:38 a.m., defendant called Alcala and said "that's 50th Street." (Tr. at 34.) Alcala said, "I can't hear you." Defendant said: "I said what street? Is on 50th, right?" Alcala replied, "Burnham and what?" Defendant said: "no, no, no, not that." Alcala replied: "yeah, yeah, yeah. All right." (Tr. at 34.) Nohelty surmised that the reference to "50th Street" was code for the amount of drugs defendant was to receive. The address to which defendant was going was 1945 W. Burnham (where Alcala's ex-wife lived), nowhere near 50th Street.[2] (Tr. at 36.)

Also that morning, officers intercepted calls between Alcala and his ex-wife Carolyn, in which Carolyn asked Alcala "how many – do I give 40 tortillas to this guy?" (Tr. at 37.) Alcala said, "yes, yes, give him that." (Tr. at 38.)

Defendant arrived at 1945 W. Burnham in the same green Honda officers had seen previously, opened the trunk, and Carolyn came out of the building and put a large black garbage bag into the trunk; defendant drove away. (Tr. at 39.) Nohelty then instructed

---

[2] Nohelty testified that earlier that morning Alcala went to the Burnham address but he left before defendant arrived. (Tr. at 47.) It is unclear how officers learned that the meeting on August 20 was to occur at the Burnham address as opposed to Alcala's apartment, which was on Humboldt.

3

Special Agent Randy Furmack and Detective Steve Wellens to follow defendant and stop him if he violated any traffic laws. (Tr. at 39-40.) Nohelty testified that he wanted the stop to be based on a traffic violation so officers would not have to reveal the wire taps. (Tr. at 40.) However, he stated that he was still going to have defendant stopped even if he did not violate any traffic laws. (Tr. at 50.)

Wellens testified that at about 10:50 a.m. on August 20, he received a dispatch from Nohelty advising him to pull over defendant's Honda if the vehicle committed a traffic violation so as not to alert the driver that there was a larger investigation going on. (Tr. at 54.) Wellens saw defendant traveling north on North 27th Street and paced him driving 45 mph in a 30 mph zone. He activated the lights and siren in his unmarked car and pulled defendant over. (Tr. at 55.)

Wellens approached the vehicle, explained that he was stopping defendant for speeding, and received defendant's driver's license. Wellens asked defendant if he had received any traffic tickets or been arrested for anything, and defendant responded that he had a speeding ticket about five years ago. Defendant remained in the vehicle while Wellens ran his information. (Tr. at 57-58.)

Wellens received information about defendant's prior record, which included two drug distribution charges and a gun offense. Wellens walked back to the vehicle and asked defendant for consent to search. Defendant declined. Wellens then asked defendant to step out for a pat-down, pursuant to which Wellens found a bulge in defendant's left front pants pocket that turned out to be $3000 cash.[3] (Tr. at 58.) Wellens

---

[3]Wellens conceded that defendant had made no gestures or movements that caused him to believe that defendant was attempting to endanger the officers. (Tr. at 63.)

4

put defendant back in his vehicle and returned to his squad to see if the driver's license check, which was taking longer, was completed. While he was waiting, Wellens called for a drug detection canine. (Tr. at 59.)

The license check eventually revealed that defendant had a valid license, and Wellens again approached the vehicle and explained that he had learned of defendant's drug convictions. (Tr. at 59.) At that point, it was about 11:25 a.m. (Tr. at 62.) Wellens then told defendant that a drug dog was on route, to which defendant replied, "oh, you're going to find the stuff anyways. It's on the front seat. It's in the bag. Go ahead and search." (Tr. at 59.) Wellens searched that bag and found two containers containing cocaine and marijuana, as well as a digital scale. (Tr. at 60.) Defendant was then arrested, and Wellens asked him if he had anything else in the car. Defendant stated that he had about 50 pounds of marijuana in the trunk, which Wellens also seized. (Tr. at 61.)

Wellens testified that at no point during the encounter was defendant advised that he was free to leave, and he was, in fact, not free to leave because Wellens was conducting a narcotics investigation. (Tr. at 63.) Wellens admitted that whether defendant consented or not, based on Nohelty's instructions, he had no intention of letting defendant leave without searching the vehicle. (Tr. at 65.)

## II. DISCUSSION

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." Maryland v. Dyson, 527 U.S. 465, 466 (1999). However, there are

---

Wellens stated that he patted defendant down because of his prior convictions, which defendant had concealed, and because some people had exited their vehicles to observe what officers were doing with defendant. (Tr. at 64.)

5

exceptions to the warrant requirement. In the present case, the government contends that based on the "collective knowledge" of law enforcement and pursuant to the "automobile exception" to the warrant requirement there was probable cause to stop and search defendant's vehicle for controlled substances. Alternatively, it contends that even if there was no probable cause to stop and search for drugs, officers validly stopped defendant for a traffic violation, after which he consented to the search. Because I conclude that probable cause existed, I need not address the government's alternate theory.

**A.    Applicable Legal Standard**

The Supreme Court has held that where there is probable cause to believe that an automobile contains contraband the Fourth Amendment does not require that officers obtain a warrant before searching. Dyson, 527 U.S. at 466-67 (1999); Carroll v. United States, 267 U.S. 132, 153 (1925). This exception to the warrant requirement is based both on the mobility of, and the lesser expectation of privacy in, automobiles. United States v. Washburn, 383 F.3d 638, 641 (7th Cir. 2004), cert. denied, 125 S. Ct. 1746 (2005).

Probable cause exists if, given all of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place. United States v. Huebner, 356 F.3d 807, 813 (7th Cir. 2004). "So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." United States v. Sawyer, 224 F.3d 675, 679 (7th Cir. 2000).

Under the so-called "collective knowledge doctrine," the officer who actually conducted the seizure need not personally know all of the facts that constitute probable cause if he is reasonably acting at the direction of another officer, whose knowledge is

6

sufficient to constitute probable cause. United States v. Parra, 402 F.3d 752, 764 (7th Cir. 2005).

> Courts have applied the collective knowledge doctrine in two situations: first, when information from one jurisdiction is actually relayed to officers or agencies in another jurisdiction to permit coordination of investigations and the speedy apprehension of fleeing suspects, and second, when officers are in communication with each other while working together at a scene. In the latter group of cases, the knowledge of the officers may be imputed to one another even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed (though of course the information actually possessed by the officers must be sufficient to justify the stop or arrest).

Id. (internal citations and quote marks omitted). The collective knowledge doctrine applies to searches of automobiles, as well as stops. See United States v. Ledford, 218 F.3d 684, 688-89 (7th Cir. 2000).

**B.    Analysis**

In the present case, the record does not reveal that Detective Wellens himself was aware of sufficient facts upon which he could reasonably conclude that defendant had drugs in his car. However, Nohelty possessed additional knowledge about defendant's activities, and Wellens, who was also working on this investigation as one of the surveillance officers, acted at Nohelty's direction in making the stop and conducting the search. See United States v. Nafzger, 974 F.2d 906, 913 (7th Cir. 1992) ("If the officer issuing the flyer or bulletin concludes that the facts he is aware of authorize a stop or arrest and relays that conclusion to another officer, that officer may rely on the conclusion, regardless of whether he knows the supporting facts."); United States v. Valencia, 913 F.2d 378, 382-83 (7th Cir. 1990) ("The police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the

7

direction of another officer or police agency. In that case, the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause."). Therefore, the question becomes whether Nohelty, who directed the stop, had sufficient information to establish probable cause. I agree with the magistrate judge that he did.

Nohelty knew that defendant was in regular contact with Alcala, the subject of a drug distribution investigation. Pursuant to the wire taps officers had obtained (which themselves had to be based on the probable cause determination of a neutral judge), officers had made separate seizures of $11,000 and $27,000 in cash tied to Alcala. These seizures could reasonably reinforce Nohelty's suspicions of Alcala's activities. Nohelty also knew that Alcala had been warned that officers were watching him, from which Nohelty could reasonably infer that Alcala was engaging in criminal activity.

Officers were able to link defendant to Alcala through the wire. Defendant's conversations with Alcala, while perhaps on their face innocent, to a trained and experienced narcotics investigator like Nohelty,[4] were sufficient to give rise to legitimate suspicions that defendant was also participating in narcotics trafficking. See United States v. Funches, 327 F.3d 582, 586 (7th Cir. 2003) (stating that law enforcement officers are entitled to draw reasonable inferences from the facts based on their training and experience). Further, officers surveilling defendant and Alcala were able to corroborate the statements overheard on the wire. For instance, on August 3 and 4, officers heard

---

[4]Nohelty testified that he had been a law enforcement officer for seventeen years and a detective for five. He stated that he had been assigned to the drug and gang unit for eight years and that during that time he had been predominantly investigating drug trafficking crimes. (Tr. at 6-7.)

8

defendant ask Alcala if he had "any good news," and Alcala replied that he was "getting it." (Tr. at 11.) Officers then saw defendant drive to Alcala's building and presumably place something in the trunk. Officers later intercepted a call in which defendant told Alcala that he had "20 for him and would be over to see him" (Tr. at 16), after which officers saw defendant arrive at Alcala's building in a white van previously used by Alcala. Finally, on August 19 and 20, officers again overheard defendant tell Alcala to "let me know when you have the good news." (Tr. at 20.) Defendant also asked "how the CD is. Is it nice?" (Tr. at 20.) The next day, a meeting was arranged, and while en route defendant asked Alcala the odd question about "50th Street," which Nohelty surmised referred to the drug amount because the address to which defendant was traveling was nowhere near 50th Street. (Tr. at 37-38.) Officers then saw defendant arrive and receive a bag from Alcala's ex-wife and quickly leave. Prior to the stop and search, Nohelty was also aware of defendant's prior drug distribution convictions, which supported the inference that drugs would be found in the car. See United States v. Huerta, 247 F. Supp. 2d 902, 911 (S.D. Ohio 2002) (collecting cases). Based on all of this evidence, it was reasonable for Nohelty to believe that Alcala and defendant were engaging in drug transactions, and that a search of defendant's vehicle on August 20 would uncover evidence of the crime.

Defendant notes that officers did not overhear him specifically discussing drug transactions. However, direct evidence of drug dealing is not necessary to a determination of probable cause. United States v. Malin, 908 F.2d 163, 165 (7th Cir. 1990) (collecting cases). Officers are permitted to draw reasonable inferences from the facts based on their training and experience, and "it is well known that drug dealers commonly use code language out of fear that their conversations will be intercepted." United States v. Harris,

9

271 F.3d 690, 702 (7th Cir. 2001). As the Seventh Circuit noted in sustaining a jury verdict based in part on recorded calls:

> The fact that tapes of the conversations implicating Vega in the drug conspiracy may, in certain parts, have been somewhat unclear, does not preclude a determination that he participated in the conspiracy. As we observed in United States v. Zanin, 831 F.2d 740, 744 (7th Cir. 1987): "Conversations regarding drug transactions are rarely clear. A fact-finder must always draw inferences from veiled allusions and code words." In this case the jury was confronted with conversations which contained "code words" that, when considered in isolation, might seem unclear, veiled and almost nonsensical, but when analyzed properly, in the context of the totality of the evidence, can be clearly seen to be "code words" for drugs. . . . It is true that, advisedly, no explicit mention was ever made of cocaine or other drugs in any of Vega's conversations with the Zambranas. However, a case was made, which was more than strong enough to convince the jury, the trier of fact, that Vega used terms like "chickens," "roosters" and "it" as code words for drugs. Not only are code words always used by drug conspirators when they realize, as they do in today's drug culture, that their telephone conversations are frequently intercepted, such terms were obviously used by the conspirators in this case.

United States v. Vega, 860 F.2d 779, 795 (7th Cir. 1988). The Seventh Circuit has frequently upheld judicial determinations "which have relied upon inferences that 'code words' or obscure language were meant to refer to drugs." Id. at 798; see Harris, 271 F.3d at 703 (finding that although the words "drugs" or "cocaine" were not contained in the recorded conversations, the comments made little or no sense unless understood as a code lingo for drugs).[5] In the present case, there are no reasonable alternate explanations for the odd language defendant and Alcala used in their conversations, and under the totality of the circumstances it was reasonable for Nohelty to believe they were talking

---

[5]In the present case, Nohelty surmised that defendant's reference to "50th Street" was a reference to drug amount. In Harris, the court found that the phrase "'You know the story is for you to meet me on Eighteenth?' was code for Harris' refusal to sell the two ounces for any amount less than $ 1,800." Id.

10

about drugs. See Funches, 327 F.3d at 587 (stating that it is often helpful to consider possible innocent alternatives and finding probable cause in the absence of reasonable explanation other than drug dealing).

Defendant also argues that there was no evidence leading officers to believe that Carolyn Alcala was putting a bag of drugs in his car on August 20, 2004. I again disagree. While officers had no information that Alcala regularly used garbage bags to store drugs, the phone calls between Alcala and defendant, and Alcala and Carolyn, just before the encounter could reasonably cause Nohelty to believe that a drug deal was taking place. Officers also knew that Alcala had visited Carolyn earlier that morning.

For all of these reasons, and those stated by the magistrate judge, I conclude that there was probable to stop and search defendant's car.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (Docket # 32) is adopted as stated herein, and defendant's motion to suppress (Docket # 20) is **DENIED**.

**IT IS FURTHER ORDERED** that this matter is scheduled for **STATUS** on **Wednesday, January 4, 2006, at 11:30 a.m.**

Dated at Milwaukee, Wisconsin, this 22nd day of December, 2005.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

11